# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 211 | **DATE** | 6/2/2004 |
| **CASE TITLE** | | Europaper v. IMMS & Peter Matsukis | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Europaper's Motion for Summary Judgment against Matsukis (Doc. #36)
> Matsukis's Motion for Summary Judgment against Europaper (Doc #31)
> Europaper's Motion to Strike (Doc. # 48)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial [set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] . Enter Memorandum Opinion and Order. For the attached reasons, Europaper's motion to strike Matsukis's affidavit is GRANTED. Matsukis's motion for summary judgment (doc. #31) is DENIED. Europaper's motion for summary judgment on Counts II and III (doc. #36) is GRANTED. The Court grants summary judgment in favor of Europaper and against Matsukis in the amount of $457,441.59. Status hearing set for June 14, 2004 at 9:30 a.m.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUN 0 3 2004 | |
| ✓ | Docketing to mail notices. | | date docketed | 49 |
| | Mail AO 450 form. | | JXM | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| JHC | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EUROPAPER B.V., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 01 C 211 |
| v. | ) | |
| | ) | The Honorable William J. Hibbler |
| INTEGRATED MATERIAL MANAGEMENT | ) | |
| SERVICES, INC. A/K/A SIKUSTAM CORP., | ) | |
| AND PETER MATSUKIS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In October 2000, Europaper, a Dutch corporation, contracted to sell Illinois-based IMMS 5,000 metric tons of waste paper at the price of $106.50 per metric ton on a FAS (free alongside ship)[1] Antwerp or Rotterdam basis. (Pl. Local Rule 56.1(a) Statement of Facts (Pl. Statement), ¶ 47, Def. Local Rule 56.1(b)(3)(A) Statement of Facts (Def. Statement ) ¶ 47). Thus, once the waste paper was brought to dock at Antwerp or Rotterdam, IMMS became obligated to Europaper for the particular quantity ordered and delivered. (Pl. Statement ¶ 50; Def. Statement ¶ 50). Bram Reek signed the contract on behalf of Europaper, and Peter Matsukis signed the contract on behalf of IMMS. (Pl. Ex. G). Europaper delivered 2,044.02 metric tons of waste paper in three separate shipments on November 8, 2000, November 16, 2000 and November 21, 2000, and IMMS accepted delivery of these shipments. (Pl. Statement ¶ 56-57; Def. Statement ¶ 56-57).

---

[1]"Free alongside ship" or f.a.s. values "include all costs of transportation and delivery of goods to the dock." 22 C.F.R. § 211.2(k). (CHECK CITE).

1

Unfortunately, the rest of the contract was not fulfilled so smoothly. Although IMMS accepted $217,688.13 worth of waste paper in the three November 2000 shipments, it paid Europaper only $20,000 for these shipments. On November 29, Matsukis sent an e-mail to Reek, explaining that he would soon deliver in person an $80,000 check and wire the remaining balance in the following week. (Pl. Ex. I). Believing that Matsukis would solve IMMS's apparent cash flow problems, Europaper shipped another 1,036.96 metric tons on December 1. (Pl. Statement ¶¶ 61-62; Def. Statement ¶¶ 61-62). But by December 4, IMMS had yet to send the $80,000 payment that Matsukis promised in the previous week. (Pl. Ex. N; Pl. Statement ¶ 64; Def. Statement 64). On December 6 the $80,000 promised by Matsukis had yet to arrive. (Pl. Ex. I). Matsukis and Reek met on that day, however, and agreed that IMMS owed Europaper $328,124.37 and that it had paid $20,000 already. At the meeting, Matsukis also promised Reek that $80,000 had been transferred by bankwire that day, that he would wire $100,000 by Thursday of the following week, and that he would pay the remaining $128,124.37 by a letter of credit early the following week. (Pl. Ex. I). But Matsukis's claim that $80,000 had been wired that day turned out to be a lie, for no such amount was ever wired from IMMS to Europaper, and his promises to pay the remaining balance in two further payments also went unfulfilled.

And so the problems between IMMS and Europaper mounted. In an attempt to explain IMMS's difficulties, Matsukis sent an e-mail to Reek on December 6. (Pl. Ex. P). Matsukis explained that a price drop in the waste paper market and the expense of paying freight in advance had placed IMMS in a "serious deficit" and asked Reek to "have patience with" him, promising that his waste-paper brokering business would go smoother. (Pl. Ex. P). Reek sent Matsukis a response on December 8 in which he detailed Europaper's position regarding IMMS's outstanding balance.

2

(Pl. Ex. Q). Reek expressed frustration that the balance had yet to be paid and that none of Matsukis's promises to send payment had been fulfilled. (Pl. Ex. Q).

Despite IMMS's failure to pay Europaper, two additional shipments (for 1,047.68 and 527.29 metric tons) arrived in Rotterdam on December 10. (Pl. Exs. R & S; Pl. Statement ¶¶ 70-71; Def. Statement ¶¶ 70-71). The two December 10 shipments brought IMMS's total balance to $495,808, of which it still had paid only $20,000. (Pl. Statement ¶ 68; Def. Statement ¶ 68; Pl. Ex. T). Matsukis sent Reek another e-mail on December 13 explaining many of the problems IMMS experienced. (Pl. Ex. U). In the e-mail, Matsukis claimed that 1,000 metric tons of the shipped waste paper were supposed to have been shipped to "Norwegian," but that "Norwegian" never confirmed the order and that he had not found another purchaser. (Pl. Ex. U). Matsukis then claimed that another 1,000 metric tons of waste paper were in fact shipped to Shanghai but that the order was not confirmed and awaiting final pricing. (Pl. Ex. U). Matsukis claimed that the third 1,000 metric tons had been shipped to Navashiva, but that order also had not been confirmed. (Pl. Ex. U). Matsukis explained that part of IMMS's problem was that the ONP (Old Newspaper) market had crashed and the price being offered for the paper was substantially less than expected. (Pl. Ex. U). Matsukis promised to "make sure that all the material and freight will be paid, but . . . a little later than . . . expected" and asked Reek to "have some patience [so that IMMS can] get all things done right." (Pl. Ex. U). Matsukis also wrote that he had "confirmed with [his] bank that $70,000 . . . has been wired to [Europaper]." (Pl. Ex. U).

But contrary to Matsukis's claim, he had never wired Europaper $70,000. (Pl. Statement ¶ 74; Def. Statement 74; Matsukis Dep. at 173). By December 13, 2000, the relationship between IMMS and Europaper broke down completely. Europaper sent IMMS an invoice for $47,588.52 for,

3

among other things, interest on the balance owed and storage. (Pl. Ex. T). Reek also sent Matsukis

an e-mail threatening to "take all necessary actions" to recover the $475,858.68 (not including the

recent invoice for $47,000) that IMMS owed to Europaper. (Pl. Ex. T). Matsukis responded the

same day in another e-mail that a business associate who owed him money would send Europaper

$100,000 and that he was owed $335,000 from "Lexious" (which he would send to Europaper when

received). (Pl. Ex. W; Pl. Statement ¶ 76; Def. Statement 76). In the December 13 e-mail,

Matsukis suddenly claimed that there had been $30,000 in confirmed wires, despite the fact that

every other e-mail between the parties indicated that only $20,000 had actually been wired. (Pl. Ex.

W). In a story that now sounds like a broken record, Matsukis's promises to remit $335,000 and to

have an associate send $100,000 were never fulfilled. (Pl. Statement ¶ 77; Def. Statement ¶ 77).

On December 27, Europaper wrote Matsukis to inform him that the balance of more than $438,000

was still owed. (Pl. Ex. X; Pl. Statement ¶ 79; Def. Statement ¶ 79). Europaper attempted to

resell some of the paper that Matsukis left sitting dockside, and received $66,005.70 in two separate

sales. (Pl. Statement ¶¶ 84-85; Def. Statement ¶¶ 84-85; Pl. Ex. Y).

In January 2001, Europaper sued IMMS and its holding company, Sikustam, for breach of

contract. Europaper claims that IMMS and Sikustam now owe it $457,441.59 ($543,447.29 in

invoices detailed above minus $20,000 in payment and $66,005.70 in mitigation). (Pl. Statement

¶ 86).[2]

---

[2] Matsukis denies this statement. (Def. Statement ¶86). However, Matsukis fails to
point to any evidentiary support for his denial. Local Rule 56.1(b)(3)(A) requires parties
responding to a moving parties statement of undisputed facts to provide "a response to each
numbered paragraph in the moving party's statement, including, in the case of any disagreement,
specific references to the affidavits, parts of the record, and other supporting materials relied
upon." L.R. 56.1(b)(3)(A); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir.
1994). Matsukis fails to identify the parts of the record relied upon for this denial and the Court

There is more to this story however, because IMMS is bankrupt and Europaper wants to collect the debt from Matsukis, and so amended its complaint to include a breach of contract and fraud claim against Matsukis, arguing that the corporate veil should be pierced. Matsukis formed IMMS in 1997. (Pl. Ex. D (Matsukis Sep. 19, 2002 Dep.) at 18). During its entire existence, IMMS held but one board meeting—the meeting at which Matsukis signed the application for incorporation and named himself the sole director and officer of IMMS. (Pl. Statement ¶¶ 5, 30; Def. Statement ¶¶ 5, 30). The only corporate book or record that exists for IMMS is the incorporation document. (Pl. Statement ¶ 15; Def. Statement ¶ 15). The record contains no evidence that IMMS ever passed any corporate bylaws. Furthermore, IMMS did not even file tax returns for 1999, 2000, or 2001. (Pl. Statement ¶ 25; Def. Statement ¶ 25). IMMS never issued a dividend or paid a salary. (Pl. Statement ¶¶ 22, 26; Def. Statement ¶¶ 22, 26). And throughout its existence, IMMS had only one employee, shareholder, director and officer—Matsukis, who made a single $1,000 investment to capitalize IMMS. (Pl. Statement ¶¶ 9-13, 28; Def. Statement ¶¶ 9-13, 28).[3]

Although Matsukis does not have any corporate books or records for IMMS (Pl. Statement ¶ 15; Def. Statement ¶ 15), he did, however, admit to commingling funds from his corporations with his own personal funds. For example, Matsukis used IMMS money to buy himself a 2000 Buick Regal. (Pl. Statement ¶ 31; Def. Statement ¶ 31). He also used IMMS money to buy his wife a 2000

---

therefore disregards his statement and deems the Plaintiff's Statement ¶ 86 to be admitted.

[3] At some point, Matsukis also created Sikustam, a holding corporation for IMMS. (Pl. Statement ¶ 6; Def. Statement ¶ 6). Matsukis was also the only officer and shareholder of Sikustam. (Pl. Statemetn ¶ 9; Def. Statement ¶ 9). The record, however, reveals little else about Sikustam, and from Matsukis's deposition, it seems even he was not clear about the relationship between the two corporations. (Matsukis Sept. 19, 2002 Dep. at 35-40).

Dodge Durango. (Pl. Statement ¶ 32; Def. Statement ¶ 32). IMMS paid Matsukis's mother $1,700

to babysit Matsukis's children. (Pl. Statement ¶ 21; Pl. Ex. E; Def. Statement ¶ 21). Matsukis

allowed IMMS and Sikustam to use his furniture, his computers, and his refrigerator. (Pl. Statement

¶¶ 38-41; Def. Statement ¶¶ 38-41). IMMS rented office space from Matsukis's wife, relying on an

oral lease and paying $5,000 per month.[4] (Pl. Statement ¶¶ 17-20; Def. Statement ¶¶ 17-20).

Europaper moves for summary judgment against Matsukis on both its breach of contract and

fraud claims. Matsukis moves for summary judgment against Europaper. Summary judgment is

proper when there is no genuine issue of material fact and the moving party is entitled to judgment

as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986); Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of

proving there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. In response, the

non-moving party cannot rest on bare pleadings alone but must designate specific material facts in

the record showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216

F.3d 596, 598 (7th Cir. 2000). In ruling on a motion for summary judgment, the Court must

construe all facts in a light most favorable to the non-moving party as well as view all reasonable

inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986). A genuine issue of material fact exists only if there is sufficient evidence for

a jury to return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 249; *Alexander*

---

[4] When asked how the parties arrived at the $5,000/month price, Matsukis testified that
"[w]e just did." (Matsukis Sept. 19, 2002 Dep. at 26-27). Of course, Europaper could have
bolstered its claim that Matsukis commingled funds by producing evidence that the
$5,000/month fee was substantially higher than the going market rate for comparable office space
in West Dundee, but it failed to do so.

*v. Wisconsin Dep't of Health and Family Servs.*, 263 F.3d 673, 680 (7th Cir. 2001); *Insolia*, 216 F.3d at 598-99.

In general, shareholders, officers, and directors of a corporation are not liable for its debts and obligations. *Cosgrove Distrib., Inc. v. Haff*, 343 Ill.App.3d 426, 428-29, 798 N.E.2d 139, 141 (2003).[5] But the corporate veil shielding shareholders and officers from liability can be pierced if "(1) a unity of interest and ownership that causes the separate personalities of the corporation and the individual to no longer exist; an (2) the presence of circumstances under which adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice or promote inequitable consequences." *Id.* Courts look to many factors to determine whether to pierce the corporate veil. These factors include: inadequate capitalization; failure to issue stock; failure to observe corporate formalities; nonpayment of dividends; insolvency of the debtor corporation; nonfunctioning of the other officers or directors; absence of corporate records; commingling of funds; diversion of assets from the corporation by or to a shareholder; failure to maintain arm's-length relationships among related entities; and whether the corporation is a mere facade for the operation of the dominant shareholders. *Id.* at 429; 798 N.E. 2d at 141-42; *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill.App.3d 1084, 1088, 664 N.E.2d 328, 331 (1996).

Matsukis argues that Europaper relies solely on the fact that IMMS was undercapitalized to pierce the corporate veil. (Matsukis Response to Summ. J. at 8). The Court disagrees. Europaper

---

[5] The Court has jurisdiction over this dispute by diversity, as the parties are of diverse citizenship and the amount in controversy is in excess of $75,000. 28 U.S.C. § 1332(a). A federal court sitting in diversity applies the substantive law of the forum state as well as its conflicts rules. *Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 96 S. Ct. 167, 46 L. Ed. 2d 3 (1975). Although a substantial part of the performance of this contract occurred in the Netherlands, neither party argues that anything other than Illinois law should apply, and the Court therefore will apply Illinois law.

has shown not only that it is undisputed that IMMS was undercapitalized (it had no assets and Matsukis invested only $1,000 in IMMS at the time of incorporation, making no further capital investments in the corporation), but also that it is undisputed that virtually all of the factors that might justify the piercing of the corporate veil are present. IMMS never issued any stock. It never held any meetings of its board of directors but for the meeting necessary to sign the papers for incorporation. It never paid any dividends. It had only one shareholder, director and employee during its entire existence. It failed to file tax returns in three consecutive calender years. It failed to maintain corporate records of any sort. It failed to follow corporate formalities—leases were entered into without written agreements, IMMS paid Matsukis commissions and also paid for his insurance premiums without any corporate resolutions, and IMMS had no corporate by-laws. And Matsukis commingled funds. He used IMMS money to pay for cars for himself and his wife and to pay his mother for baby sitting services. He allowed IMMS to use his furniture, his computer equipment, and his refrigerator. But more amazing still is that Europaper wrote in its statement of facts that "IMMS is Matsukis" and Matsukis *admitted* this fact. (Pl. Statement ¶ 24; Def. Statement ¶ 24). The Court is hard pressed to imagine a more compelling set of facts to demonstrate a unity of interest between a sole shareholder and the corporation. The adherence to the fiction of a separate corporate existence would also promote injustice or promote inequitable consequences in this case. It is undisputed that Matsukis commingled funds. It is also undisputed that he repeatedly promised that he had already wired part of the money IMMS owed to Europaper and that Europaper continued to fulfill its obligations under the contract because of these promises. Illinois courts have pierced corporate veils to avoid injustice when failure to do so would unfairly enrich one of the parties. *B. Kreisman & Co. v. First Arlington Nat'l Bank*, 91 Ill. App. 3d 847, 415 N.E. 2d 1070 (1980).

8

Matsukis in his last gasp argues that there is no evidence in the record that Matsukis agreed to personally guaranty the contract between IMMS and Europaper. Of course, this is true. But it is also entirely irrelevant to the question of whether the corporate veil should be pierced. If Matsukis had personally guaranteed the contract, there would be no need to pierce the corporate veil. Piercing the corporate veil is a means to hold a shareholder or director liable for the debts and obligations of a corporation despite the fact that ordinarily a shareholder or director is not liable for those debts and obligations. *Cosgrove Distributors, Inc.*, 343 Ill.App.3d at 428-29, 798 N.E.2d at 141. The Court finds that there is no genuine issue of material fact as to whether there was unity of interest and ownership between Matsukis and IMMS that causes the separate personalities of the corporation and the individual to no longer exist and that adherence to the fiction of a separate corporate existence would promote an inequitable consequences. Thus, the Court finds that as a matter of law Matsukis is liable for the debts of IMMS.

Matsukis next contends that summary judgment is improper because the amount IMMS owed to Europaper is also in dispute. Again the Court disagrees. Matsukis first argues that Reek unilaterally altered the contract and required Matsukis to change the payment terms from an open account to cash against document. Matsukis points to a December 28, 2000 e-mail. But Matsukis's deposition makes clear that the parties never had an open account payment agreement. Repeatedly, throughout Matsukis's deposition, he admits that IMMS became obligated to pay Europaper when the waste paper arrived. (Pl. Ex. C (Matsukis May 23, 2002 Dep.) at 33, 38, 42). Further, Matsukis's deposition testimony clearly conflicts with his assertion. In his deposition, Matsukis admitted that he *agreed* to the change in payment terms on October 11, 2000, during contract negotiations and before Europaper had even shipped the first installment of the waste paper.

(Matsukis May 23, 2002 Dep. at 42). Matsukis also argues that Reek refused to release the bills of lading, which prevented him from reselling the waste paper. In his brief, Matsukis argues that "based upon information and belief, Bram Reek instructed all freight carriers who delivered the materials to IMMS to not release the bills of lading to IMMS. Based upon information and belief, this was done so that Europaper, through Fibrenet, could resell the materials to other entities as set forth below." But Matsukis cannot rely on conjecture to defeat a summary judgment motion. At summary judgment, a party must "put up or shut up" and show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003); *Price v. Rockford*, 947 F.2d 829, 832 (7th Cir. 1991) (statements based on information and belief cannot be used to defeat summary judgment). Furthermore, Matsukis's reliance on his self-serving affidavit is improper. The affidavit conflicts with not only his prior deposition testimony (as noted above) but also the e-mail correspondence between himself and Reek. Matsukis's e-mails to Reek repeatedly acknowledge IMMS's indebtedness to Europaper and Matsukis acknowledges that IMMS owed Europaper in excess of $495,000 as of December 13, 2000. (Pl. Ex. W). Further, in multiple e-mails, Matsukis explains many of the problems IMMS was having in paying Europaper. Not once did Matsukis mention that Reek had withheld bills of lading. Instead, Matsukis explains in the e-mails that IMMS's problems arose from a crash in the market for waste paper. Matsukis sent at least one such e-mail on December 13, *after* Europaper had delivered the final shipment of waste paper. (Pl. Ex. U). Finally, in a December 13 e-mail, Matsukis again explicitly contradicts the claim made in his affidavit that Reek had withheld the bills of lading because he explains that IMMS *had actually shipped* 3,000 metric tons (of the approximately 4,600 metric tons delivered) to "Norwegian," Shanghai, and Navashiva, but that none of the potential

10

buyers had confirmed the orders because of a drop in the price for the waste paper. (Pl. Ex. U). Matsukis cannot rely on a self-serving affidavit that clearly contradicts prior deposition testimony and other admissions made by Matsukis to create an issue of material fact. *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1056 (7th Cir. 2000).[6] The Court finds that there is no genuine issue of material fact as to the total amount IMMS owed Europaper: IMMS owed Europaper a total of $543,447.29. (Pl. Exs. H, K, M, R, S, T).

Matsukis's final argument is that Europaper has underreported the amount it received when it resold the waste paper, and thus he and IMMS is not liable for the amount Europaper claims that it is. Matsukis's argument is premised on his contention that "Reek through his two companies, Europaper and Fibrenet, never sent the materials to IMMS and instead sent the materials to other companies from whom Fibrenet, not Europaper, received the proceeds." (Def. Response to Pl. Summ. J. at 5). But again, Matsukis rests his argument on "information and belief." Although he

---

[6] Europaper has moved to strike Matsukis's affidavit. As explained earlier, Matsukis's self-serving affidavit is littered with statements that conflict with his prior deposition testimony. A party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony. Consequently, "[w]here a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001). Moreover, although the affidavit purports to be based on facts within the affiant's personal knowledge, the affidavit repeatedly refers to facts that are based on information and belief. Throughout his response to Europaper's summary judgment Matsukis refers to the affidavit and states a fact based on "information and belief." For example he states that Reek instructed freight carriers not to release bills of lading based on information and belief and that Reek sold the materials to other companies based on information and belief. Portions of an affidavit relying on "information and belief" should be stricken. *Weiss v. Cooley*, 230 F.3d 1027, 1034 (7th Cir. 2000). The affidavit is so littered with statements in conflict with other sworn testimony and statements relying only on Matsukis's speculation that the Court will disregard it in its entirety. Europaper's motion to strike the affidavit is GRANTED.

11

submits bills of lading,[7] which he claims (without evidentiary support) were altered by Reek, nothing

in these bills of lading, other than Matsukis's own speculation, links them to Europaper. Europaper

submitted evidence that it received $66,005.70 when it resold the waste paper that IMMS was unable

to sell. (Pl. Statement ¶¶ 84-85). Matsukis *admitted* these statements. (Def. Statement ¶¶ 84-85).

Matsukis points only to his own self-serving affidavit and unauthenticated bills of lading that do not

even mention Europaper. Matsukis cannot defeat summary judgment with rampant speculation and

cannot rely on affidavits not based on any personal knowledge and unauthenticated documents. He

must point to articulable facts that Europaper received more than $66,005.70 in mitigation, which

he has not. As a result, the Court finds there is no genuine issue of material fact as to the amount

Europaper received in mitigation— $66,005.70.

Europaper also moves for summary judgment against Matsukis on its fraud claim. Under

Illinois law, the elements of an action for fraud consist of (1) a false statement of material fact; (2)

knowledge of the falsity of the statement by the party making it; (3) intention to induce the other

party to act; (4) reliance on the false statement by the other party; and (5) damage to the other party

resulting from the reliance. *Board of Educ. of City of Chicago v. A, C and S, Inc.*, 131 Ill.2d 428,

452, 546 N.E.2d 580, 591 (1989). Matsukis seems to ignore this claim entirely. The Court finds that

Matsukis repeatedly told Europaper that he had wired money that he had not, in fact, wired.

Matsukis's assurances of payment induced Europaper to continue to ship him more waste paper.

---

[7] Furthermore, Matsukis has not complied with Local Rule 56.1(b)(3)(B), which requires
parties opposing summary judgment to submit a statement of additional facts, including
references to the affidavits, parts of the record, and other supporting materials relied upon.
Matsukis simply appends the purported bills of lading, none of which are authenticated, to his
brief in response to Europaper's motion for summary judgment.

And because Europaper shipped Matsukis waste paper that he could not pay for, it was damaged. The elements of fraud are satisfied, and the Court grants summary judgment in favor of Europaper on its fraud claim.

Matsukis's dealings with Europaper were riddled with lies, broken promises, and shenanigans. The only evidence Matsukis points to in defense of Europaper's summary judgment motion is a self-serving affidavit that contradicts all of the other sworn testimony given by Matsukis. This last gasp effort to stave off his creditor falls short. The Court finds that there is no genuine issue of material fact as to whether Matsukis should be liable for the debts of IMMS to Europaper. The Court further finds that there is no genuine issue of material fact as to whether IMMS breached the contract it had with Europaper and that Matsukis committed fraud when he repeatedly lied about having sent Europaper partial payment for IMMS's debts. Finally, the Court finds that there is no genuine issue of material fact as to the amount IMMS owed Europaper. Accordingly, the Court grants summary judgment in favor of Europaper against Matsukis in the amount of $457,441.59 ($543,447.29 in invoices minus $20,000 in payment tendered and $66,005.70 in mitigation) on Counts II and III.

IT IS SO ORDERED.

6/2/04
Dated

The Honorable William J. Hibbler
United States District Court